Document Number Case Number
11   07–C–0186–C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
10/04/2007 11:15:14 AM CDT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

KEITH E. MARTIN,

                Plaintiff,                OPINION AND ORDER

    v.                               07-C-0186-C

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

Plaintiff Keith Martin brings this action for judicial review of a partially unfavorable decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On January 22, 2003, plaintiff filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 216(i), 223(d), alleging that he had been disabled since July 2002 because of depression and back pain.  After a hearing, an administrative law judge determined that plaintiff was disabled when he turned 50 years old on January 25, 2005, but not before that date.  Plaintiff argues on appeal that this line-drawing by the administrative law judge was arbitrary and not supported by substantial evidence in the record.  In addition, he contends that the administrative law judge did not have good reasons for rejecting the favorable opinion of his treating psychiatrist.  He asks this court to reverse the unfavorable portion of the administrative law judge's decision and

award him benefits for the two-and-a-half year period from July 2002 to January 2005.  In the alternative, he seeks a remand for further proceedings.

I am rejecting plaintiff's challenges and affirming the commissioner's decision.  The administrative law judge offered sound reasons, supported by the record, for not finding the opinion of plaintiff's treating psychiatrist to be persuasive.  Although I agree with plaintiff that the administrative law judge employed questionable logic in concluding that plaintiff could have performed light work up until the date he turned 50 years old but only sedentary work after that date, it is plain that that error fell in plaintiff's favor.  Accordingly, remand for a proper determination of the onset of plaintiff's disability is not warranted.

The following facts are drawn from the administrative record ("AR").

## FACTS

### A.  Background

Plaintiff was born on January 25, 1955 and was 47 years old on his alleged onset date, making him a "younger person" under the commissioner's regulations.   20 C.F.R. § 404.1562(c).  He has a high school education plus two years of college.  Plaintiff worked as a heavy machinery mechanic from the 1970s to July 12, 2002.

Plaintiff was divorced in June 1995.  He has five children who live primarily with their mother.  His two youngest children stay with him on alternating weekends.

2

### B.  Medical Evidence–Physical Impairment

Plaintiff has a longstanding history of back pain.  From roughly 2000 to 2002, plaintiff noticed that his back hurt whenever he lifted anything heavy at home or work.  A July 2002 magnetic resonance imaging scan showed evidence of chronic degenerative disc disease at L4-L5 and L5-S1, with a diffuse disk bulge at L4-L5.  Plaintiff's primary physician referred him to a neurosurgeon, Dr. Sivakumar Jaikumar.  On July 29, 2002, plaintiff told Dr. Jaikumar that his pain was about a two on a 10-point scale and was exacerbated by lifting, twisting or turning.  On physical examination, plaintiff had a normal gait and was able to tandem walk and walk heel-to-toe with no difficulty.  Strength was five out of five in both the lower and upper extremities.  Straight leg raising was negative on both sides.  Dr. Jaikumar recommended that plaintiff pursue conservative treatment such as physical therapy and use of a lumbar corset.  He indicated that plaintiff should be limited temporarily to lifting no more than 20 pounds.  AR 145-147.

At a followup visit with Dr. Jaikumar on September 9, 2002, plaintiff reported that he had been undergoing physical therapy and was doing much better.  Plaintiff said that he would like to continue with a lifting restriction of no more than 25 pounds, noting that his symptoms would flare up any time he lifted anything heavier.  Dr. Jaikumar recommended that plaintiff continue to treat his back pain conservatively and take over-the-counter pain medication during flare-ups.

3

On November 14, 2002, plaintiff told his primary physician, Dr. Wojciechowski, that he had been unable to return to his job because of his lifting restriction.  Plaintiff reported that his pain was a three on a 10-point scale and that his radicular pain had mostly resolved. Dr. Wojciechowski indicated that plaintiff should continue with the lifting restrictions recommended by Dr. Jaikumar and follow up in no more than three months.

In December 2002, plaintiff began having left-sided neck and shoulder pain. Magnetic resonance imaging of the cervical spine showed three-level disc degeneration at C3-C4 through C5-6, with a shallow disc protrusion at C4-5.  Physical findings were minimal, with no weakness or sensory deficits noted.  Plaintiff was referred to physical therapy and prescribed Ibuprofen and Skelaxin.  On February 3, 2003, nurse practitioner Sue Ipsen noted that plaintiff's cervical radiculopathy was resolving and that he had had minimal arm pain even though he had not taken any medication for nearly five days.

On February 14, 2003, plaintiff told Dr. Wojciechowski that his neck was fine and that his back was relatively stable so long as he was careful about his activities.  He said that he had been avoiding lifting and doing back strengthening exercises.  Plaintiff had been laid off from his job and was not working.

On June 17, 2003, plaintiff saw Ipsen to discuss his depression and follow up on his neck pain.  Plaintiff reported that he had constant neck and back pain that worsened with prolonged activity.  He also reported suffering from depression, stating that he had lost his

4

purpose in living.  He told Ipsen that he was being treated by Dr. Susan Olson for his depression, but he had sought out Ipsen because she was "easier to reach."  Plaintiff made it clear that he was in the process of appealing the denial of his application for social security disability and that he was looking for medical providers to support his claim that he was unable to work because of depression and neck and back pain.

In December 2003, Dr. Jaikumar referred plaintiff to Dr. Gregory Love, a pain specialist, for epidural steroid injections.  On a pain assessment, plaintiff reported that he had constant, intractable neck and back pain that he rated as a five on a 10-point scale.  Dr. Love administered epidural steroid injections at L4-L5 on January 13 and 27, 2004.  He also refilled plaintiff's prescriptions for hydrocodone and Skelaxin.  Plaintiff reported good relief from the injections.  He did not return to the pain clinic until April 15, 2004, reporting at that time that he was doing fairly well.  Dr. Love renewed plaintiff's prescriptions.  In June and again in July 2004, plaintiff reported that his low back pain had returned and was present more of the time.  On July 29, 2004, Dr. Love administered another injection.

In December 2004, Dr. Jaikumar referred plaintiff to Dr. Stephen Lindahl for the purpose of providing plaintiff with a disability rating.  Plaintiff told Dr. Lindahl that he could sit for 45-60 minutes in an appropriate chair, stand about 20 minutes, walk approximately three blocks and drive for about an hour.  He said that he could carry a basket of laundry.  He reported that doing dishes was difficult because he had trouble bending over

the sink and that he had to crawl on the floor on his hands and knees in order to vacuum. Plaintiff said his foremost concern was the sedation caused by his pain medications.  He was also concerned about his depression and his pain in general.  Dr. Lindahl observed that plaintiff shifted positions frequently while sitting.

When examining plaintiff's neck, Dr. Lindahl noted that plaintiff had mild tenderness on the right side but had normal active range of motion and strength.  Similarly, his examination of plaintiff's lumbosacral spine was largely normal, detecting only some mild right-sided tenderness and pain at the extremes of flexion and extension.  Examination of plaintiff's upper and lower extremities detected no abnormalities.

On January 17, 2005, Dr. Lindahl completed a Physical Residual Functional Capacity Questionnaire on plaintiff's behalf.  Dr. Lindahl indicated that plaintiff had cervical and lumbosacral degenerative disease with chronic pain.  He noted that plaintiff's sedation secondary to his medication was a "significant debilitating factor" and that plaintiff's depression and anxiety were conditions that affected his physical condition.  Dr. Lindahl indicated that plaintiff was capable of low stress jobs, although he predicted that plaintiff's pain or other symptoms would interfere frequently with the attention and concentration needed to perform even simple work tasks.

With respect to plaintiff's functional limitations, Dr. Lindahl reported that plaintiff could walk two to three blocks without rest or severe pain; sit for one hour continuously and

6

a total of four hours in an eight-hour day; stand for 20 minutes continuously and a total of four hours; lift 10 pounds or less occasionally; and rarely lift 20 pounds.  Dr. Lindahl indicated that plaintiff would need a job that permitted him to change position at will from sitting, standing or walking; walk around for 10-15 minutes every 45 minutes; and take one or two, 10-minute unscheduled breaks each workday.  He also predicted that plaintiff was likely to miss more than four days of work per month.

### C.  Medical Evidence–Mental Impairment

Plaintiff has a long history of depression and anxiety, including hospitalizations in 1993 and 1995.  He has been treated at different times over a period of 10 years by Dr. Susan Olson, a psychiatrist.  Plaintiff saw Dr. Olson on a regular basis from November 2000 to February 2005.  The first progress note from Dr. Olson during the relevant time period is from January 16, 2002, when Dr. Olson reported that plaintiff had had an increase in his symptoms after taking himself off Paxil "cold turkey" because of sexual side effects.  Dr. Olson changed plaintiff's medication to Effexor.  In February 2002, Dr. Olson noted that plaintiff had had a good response to Effexor and that he felt better.

Plaintiff did not see Dr. Olson again until July 2002 when he was on medical leave for his back.  Plaintiff was considering surgery and possibly taking his ex-wife back to court to lower his monthly child support payment.  Dr. Olson noted that plaintiff was angry with

7

his financial situation and at odds with his supervisor. Dr. Olson indicated that plaintiff was suffering from a moderate recurrence of his depressive disorder. Two months later, however, plaintiff presented with a brighter mood and was more optimistic, indicating that he was using conservative therapy for his back and forgoing surgery. Dr. Olson indicated that plaintiff's depression was in remission.

In November 2002, Dr. Olson noted that plaintiff was looking for a new job with light duty restrictions. He was surprised that he might need to pay child support in spite of having lost his job. Dr. Olson noted that plaintiff's depression was in partial remission. Two months later, in January 2003, plaintiff told Dr. Olson that he was still looking for a new job but was "tired" of fighting his ex-wife over child support issues and was considering filing for social security disability. Plaintiff reported that his depression and panic symptoms had worsened and that he was "unable" to look for work. Dr. Olson agreed to write a letter to plaintiff's lawyer stating that plaintiff was suffering from a depressive episode. Dr. Olson referred plaintiff to a therapist. AR 204.

On January 22, 2003, plaintiff told his therapist that he believed his ex-wife was trying to limit his contact with his children. On the positive side, he reported that he had visited Montana and California in October and was the happiest he had been in years. Plaintiff reconnected with an old friend with whom he helped start a church. AR 202.

In May 2003, Dr. Olson noted that plaintiff presented in a disheveled condition. He was in a "downward spiral," having sold his mobile home and moved in with his sister and her boyfriend. Plaintiff said that he felt unable to work because of his unremitting depression and low back injury. Plaintiff reported feeling hopeless with suicidal thoughts but no plans. AR 200.

On July 7, 2003, Dr. Olson noted that plaintiff was convinced that he could no longer work and that his only role was to be a parent for his children. Plaintiff saw himself as a victim and had difficulty accepting responsibility for his actions. At plaintiff's request, Dr. Olson referred plaintiff to a male therapist.

Plaintiff began seeing Jim Wolffe on July 9, 2003. Wolffe diagnosed plaintiff with major depression in partial remission. On August 7, 2003, Wolffe noted that plaintiff had a "narcissistic presentation," poor insight and a lot of unresolved anger regarding his ex-wife. On August 21, 2003, Wolffe advised plaintiff to stop blaming his ex-wife for all of his problems, although he noted that plaintiff's "multifactorial medical problems are reality based." AR 292. On August 27, 2003, plaintiff told Wolffe that he was leaving for a three-week trip to Montana. Wolffe noted that plaintiff appeared to have fair insight and was only mildly depressed.

On October 6, 2003, Dr. Olson noted an increase in plaintiff's symptoms of depression after his application for social security disability was denied a second time. On

October 22, 2003, Wolffe noted that plaintiff was depressed and continuing to have chronic back pain.  He noted that plaintiff was making fair progress in treatment.

Although plaintiff continued to struggle with breakthrough symptoms of depression, plaintiff's depression was generally stable from October 2003 until early 2004.  Dr. Olson noted in December 2003 that plaintiff's depression was in partial remission and Wolffe noted in January 2004 that plaintiff's status continued to improve.  On April 12, 2004, Wolffe noted that plaintiff was frustrated with having heard nothing from the social security administration regarding his appeal.  However, plaintiff's depression remained under fair to good control.  On April 19, 2004, Dr. Olson noted that plaintiff was more energetic. However, she noted that plaintiff continued to feel that he was unable either physically or emotionally to work and that his primary mission was to be available for his children.

In June 2004, plaintiff had an increase in his depressive symptoms related to his difficult financial situation and his ex-wife's claim for back child support. On July 17, 2004, plaintiff presented to the emergency room reporting that he was having thoughts of killing himself.  He said that he had felt "tired of living" for quite some time but that the feeling had worsened in the past few weeks.  Plaintiff was admitted to the hospital for five days with a diagnosis of recurrent major depression.

Plaintiff saw Dr. Olson on July 30, 2004. He reported that he had extreme financial problems and would no longer have medical insurance. Dr. Olson offered to provide plaintiff with samples of his medications.

On February 21, 2005, Dr. Olson completed a Mental Impairment Questionnaire on plaintiff's behalf. Dr. Olson indicated that plaintiff suffered from a major depressive disorder that was recurrent and severe. She indicated that although plaintiff had been compliant with his medications and outpatient psychotherapy, his prognosis for a full recovery was poor. Assessing plaintiff's functional limitations, Dr. Olson found that plaintiff had "extreme" deficiencies in activities of daily living and concentration, persistence and pace; "marked" difficulties in maintaining social functioning; and one or two episodes of decompensation within a 12-month period. (Had the administrative law judge accepted this evidence, he would have found plaintiff disabled under the listings for mental impairments. 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 (indicating that in general, those who have "marked" functional loss in two or more categories will meet the criteria for a listed mental impairment)).

Dr. Olson also found that plaintiff's mental abilities and aptitudes for unskilled work were below competitive standards in numerous categories, including the ability to maintain attention for two-hour segments, maintain regular attendance, sustain an ordinary routine without special supervision and ask simple questions or request assistance. Dr. Olson

11

explained that plaintiff had a limited attention span and frustration tolerance.  In addition, she noted that plaintiff's medications often made him sedated during the day.

Plaintiff continued to receive medications through a publicly-funded health agency. On March 4, 2005, a registered nurse noted that plaintiff's depression was moderately well controlled on medication.  AR 340.

### D.  Administrative Proceedings

Plaintiff applied for disability insurance benefits in January 2003, alleging that he had been disabled since July 2002 as a result of major depression, degenerative changes in the cervical spine and a herniated disc in the lumbar spine.  In conjunction with plaintiff's initial application and subsequent request for reconsideration, state agency consulting physicians and psychologists reviewed plaintiff's medical records in April and September 2003.  The physicians determined that plaintiff was capable of performing light work (sitting and standing about six hours each in an eight-hour day, occasionally lifting 20 pounds and frequently lifting 10 pounds).  The psychologists determined that plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence or pace; and no episodes of decompensation.  As for work abilities, the state agency psychologists found that plaintiff would have only moderate limitations in his ability to maintain attention and concentration for extended periods,

interact appropriately with the general public and accept instruction and criticism from supervisors.

After the local disability agency twice denied his claim, plaintiff requested a *de novo* hearing before an administrative law judge. A hearing was convened before Administrative Law Judge Arthur Schneider on April 12, 2005. Plaintiff, a medical expert and a vocational expert testified. Plaintiff was represented by counsel.

Plaintiff testified that he has neck pain and lower back pain with associated right hip pain and occasional numbness. He said his pain was more controlled than it had been when he first stopped working in July 2002. Bending over, prolonged standing, lifting, twisting and overhead work all made his pain worse. He also testified that he has depression and anxiety for which he takes Wellbutrin, Effexor and Klonopin. His medications make him tired during the day. His pain makes his depression worse. He testified that he is able to do light cooking. He tries to use paper plates because it hurts to bend over the sink to do dishes. His children help him clean, shop for groceries and do laundry when they visit him on weekends.

Medical expert Dr. Allen Hauer, a psychologist, testified that plaintiff suffered from a depressive disorder that fell under the category of affective disorders in the listings, 20 C.F.R,, Subpt. P., App. 1, 12.04. Analyzing the degree of functional loss, Dr. Hauer found that plaintiff had mild restriction of activities of daily living; mild restriction in social

13

functioning; moderate deficiencies of concentration, persistence or pace; and one or two episodes of decompensation. With respect to daily activities, Dr. Hauer explained that although there were periods when plaintiff lacked energy and ambition to do things, plaintiff nonetheless lived alone, saw to his own needs, provided for his children when they were with him and planned and organized his own activities. As for social functioning, Dr. Hauer explained that although plaintiff had a decreased interest in social activities, he had been described as pleasant, polite and socially competent and had maintained satisfactory relationships with family members. With respect to concentration, persistence or pace, Dr. Hauer noted that plaintiff's ability to concentrate and pay attention had been described by examiners as quite adequate, although there was some deficiency because of plaintiff's preoccupation with pain and life stressors. Dr. Hauer indicated that although plaintiff's motivation was limited because of his medication side effects and depression, it was not totally precluded.

Dr. Hauer acknowledged that his assessment of plaintiff's functional loss differed from Dr. Olson's. In his view, Dr. Olson's opinion regarding the severity of plaintiff's condition was inconsistent with her treatment records, which showed periods when plaintiff's symptoms were well-controlled.

On April 29, 2005, the administrative law judge issued a partially unfavorable decision. He found that plaintiff was disabled as of January 25, 2005, when he turned 50

14

years old, but not before that date.  In reaching this conclusion, the administrative law judge found that before January 2005, plaintiff could perform simple, routine, repetitive, low stress work at the light exertional level.  He found that apart from the 25-pound lifting limitation ordered by Dr. Jaikumar, there was little evidence supporting any other physical limitations before January 2005.   In addition, the administrative law judge noted that objective examinations had been largely normal and that plaintiff's doctors had recommended only conservative treatment.

As for mental limitations, the administrative law judge rejected Dr. Olson's opinion that plaintiff had disabling mental limitations in favor of the findings made by Dr. Hauer. The administrative law judge explained that he was discounting Dr. Olson's opinion because it was inconsistent with her treatment notes.   He determined from his review of the treatment notes that plaintiff's depression was "primarily situational and relating to his legal issues," finding that many of plaintiff's complaints of depression in 2003 and 2004 related "to his needs to obtain disability and avoidance of child support payments, with requests that his medical records be provided to the court in order to avoid child support."  AR 16. The administrative law judge also cited a progress note from February 2004 that indicated that plaintiff was planning a move to California once his child support and disability issues were resolved and another note indicating that plaintiff had visited an old friend during an extended visit to Montana and California in 2002.  The administrative law judge observed

15

that plaintiff's "initial allegations of disability appear to closely coincide with his divorce and consequent desire to avoid paying child support," suggesting "some element of secondary gain in the claimant's situation." AR 17.  In addition, the administrative law judge pointed out that Dr. Hauer had found Dr. Olson's opinion to be inconsistent with her treatment notes, which showed that plaintiff's depression was under good control.  Finally, the administrative law judge cited the opinions of the state agency consultants, who had found that plaintiff had only mild to moderate limitations.

The administrative law judge considered Dr. Lindahl's assessment, noting that Dr. Lindahl had limited plaintiff to a range of part-time sedentary employment.  The administrative law judge noted that Dr. Lindahl's evaluation was "a one-time examination after the claimant had presented himself at the clinic to obtain a disability rating," AR 17, and that the only positive evidence of any back impairment found by Dr. Lindahl was some demonstrated mild tenderness and the abnormalities noted on magnetic resonance imaging scans.  AR 16.  In addition, he noted that Dr. Lindahl did not examine plaintiff until "considerably after [plaintiff's] alleged onset of disability in 2002." AR 17.  Accordingly, the administrative law judge found that Dr. Lindahl's report did not establish that plaintiff was disabled on his alleged onset date of July 12, 2002.

The administrative law judge accepted Dr. Lindahl's report as evidence of plaintiff's abilities in January 2005.  The administrative law judge explained that even though he did

16

not find Dr. Lindahl's report to be "entirely persuasive, the claimant did turn 50 years of age on January 25, 2005." AR 18. Applying the Medical-Vocational rules for a person "closely approaching advance age" who was limited to unskilled sedentary work (specifically, Rule 201.14, Table No. 1, Appendix 2, Subpart P of the regulations), the administrative law judge found that the rules directed a finding of disabled on January 25, 2005, when plaintiff turned 50. Relying on vocational evidence adduced at the hearing, the administrative law judge found that before that date, plaintiff was not disabled because a significant number of jobs existed in Wisconsin that he could have performed given his residual functional capacity for simple, routine, repetitive, low stress light work.

The administrative law judge's decision became the final decision of the commissioner when the Appeals Council denied plaintiff's request for review.

OPINION

A. <u>Standard of Review</u>

Under 42 U.S.C. § 405(g), the commissioner's findings are conclusive if they are supported by "substantial evidence." <u>Clifford v. Apfel</u>, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts,

17

reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be. Clifford, 227 F.3d at 869.  Thus, where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

## B.  Dr. Olson's Opinion

Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions and must evaluate them in the context of the expert's medical specialty and expertise, supporting evidence in the record, consistency with the record as a whole and other explanations regarding the opinion.  Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005); 20 C.F.R. § 404.1527(d) and (e).  An administrative law judge can reject an examining physician's opinion if his reasons for doing so are supported

18

by substantial evidence in the record.  Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).  When the record contains well supported contradictory evidence, even a treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh."  Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006); 20 C.F.R. § 404.1527(d)(2).  An administrative law judge must provide "good reasons" for the weight he gives a treating source opinion.  Id.  The administrative law judge's reasonable resolution of conflicts in the medical evidence is not subject to review.  Kapusta v. Sullivan, 900 F.2d 94, 97 (7th Cir. 1989); see also Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1989) (determination of claimant's limitations is decision reserved to Social Security Administration, which must consider entire record and not only physicians' opinions).

Plaintiff contends the administrative law judge erred in rejecting the opinion of Dr. Olson, his treating psychiatrist, who offered an opinion that was consistent with a finding of disability.  I disagree.  Although a different finder of fact might have weighed the evidence differently, the administrative law judge's resolution of the evidentiary conflicts in this case was reasonable.  As plaintiff points out, Dr. Olson noted on several occasions that plaintiff showed positive signs of depression and anxiety.  However, it was not unreasonable for the administrative law judge to find that overall, Dr. Olson's notes did not corroborate the disabling level of impairment she endorsed in her Mental Impairment Questionnaire.  As noted previously, on several occasions during the relevant time period, Dr. Olson described

19

plaintiff's depression as being in remission or partial remission.  When plaintiff was most depressed, it was typically in conjunction with external stressors related to his ex-wife's requests for child support and his perception that she was trying to keep him from his children.   Notwithstanding his depression, plaintiff was capable of extended travel to California and Montana on at least two occasions during the time that he claimed he was disabled.  He was able to live alone, provide for himself and care for his children on weekends when they visited him.  Although the record indicates that plaintiff's depression continued to persist at varying levels despite medication, it was not unreasonable for the administrative law judge to concur with Dr. Hauer that Dr. Olson's restrictive opinion was not borne out by her contemporaneous treatment notes or by the record as a whole.

Certainly, plaintiff hit a low point in July 2004, when he was hospitalized.  Contrary to plaintiff's assertion, however, the administrative law judge accounted for this evidence when he adopted Dr. Hauer's opinion that plaintiff's hospitalization amounted to an extended episode of decompensation.   Although plaintiff's five-day hospital stay was indicative of a severe mental impairment, it does not establish that plaintiff was unable to perform any substantial gainful activity for a 12-month period, as required in order to establish entitlement to disability insurance benefits. 42 U.S.C. § 1382c(a)(3)(A) (defining disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

20

which has lasted or can be expected to last for a continuous period of not less than twelve months").

Plaintiff points out that the administrative law judge erred when he found that plaintiff's initial allegation of disability appeared to coincide with his divorce.  Plaintiff was divorced in 1995, seven years before his alleged onset of disability.  In spite of this error, however, the outcome would not change if this court was to remand the case.  Keys v. Barnhart, 347 F.3d 990, 995 (7th Cir. 2003) (applying doctrine of harmless error to administrative law judge's determination).  Most of the administrative law judge's discussion related to plaintiff's desire to avoid paying child support, not to any other aspects of plaintiff's divorce.  As the administrative law judge pointed out, numerous progress notes document plaintiff's anger towards his ex-wife for pursuing child support and his continuing battle with her over that issue.  Plaintiff's initial allegations of disability may not have coincided with his divorce, but they did coincide with his ex-wife's insistence on receiving child support even after plaintiff could no longer perform his past job because of his back problems.  In light of this, it is apparent that even without his error concerning the timing of plaintiff's divorce, the administrative law judge reasonably would have questioned the credibility of plaintiff's claim that he could not work.  Cf. Kadia v. Gonzales, 2007 WL 2566015, *2 (7th Cir. Sept. 7, 2007) (remanding case where immigration judge made

several mistakes and court was not "confident that had he not made those mistakes he still would have disbelieved the petitioner").

Finally, plaintiff argues that before rejecting Dr. Olson's opinion on the ground that it was not supported by her treatment notes, the administrative law judge was obligated to contact Dr. Olson to ask her for clarification. Plaintiff is incorrect. An administrative law judge does not need to recontact a medical source unless he is unable to determine from the existing record whether the claimant is disabled. 20 C.F.R. § 404.1512(e) (administrative law judge will recontact medical source when evidence is inadequate to determine disability). Even if the evidence before the administrative law judge was inconsistent, it was not necessarily inadequate to support the decision. The administrative law judge had detailed progress notes from Dr. Olson and plaintiff's therapists as well as the opinions of three non-examining psychologists. The administrative law judge acted within his discretion in finding that this evidence was adequate to determine whether plaintiff was disabled from a mental impairment. See Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994) (court "generally respects the ALJ's reasoned judgment" regarding how much evidence needed to make finding about disability).

In sum, the record before the administrative law judge in this case contained several pieces of evidence that were inconsistent with Dr. Olson's opinion that plaintiff was unable to perform any substantial gainful activity as a result of his mental impairment and which

22

suggested that plaintiff's claim to that effect might have been motivated by secondary gain. Under the circumstances, the administrative law judge could reasonably conclude that the evidence suggesting that plaintiff was not disabled, including the opinions of Dr. Hauer and the state agency psychologists, was entitled to more weight than Dr. Olson's opinion, even when accounting for her status as a specialist and plaintiff's treating physician for 10 years.

## C.  Date of Onset

The administrative law judge found that the evidence showed that from July 2002 to January 2005, plaintiff was capable of performing a limited range of light work.  He found, however, that as of January 25, 2005, plaintiff was limited to work at the sedentary level. This change in plaintiff's residual functional capacity, combined with plaintiff's turning 50 on that date, led to a finding that plaintiff was disabled as of January 25, 2005.  Had the administrative law judge not found this reduction in plaintiff's residual functional capacity, the grids would have directed a finding of "not disabled" even after plaintiff turned 50.  20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 202.13.

The administrative law judge cited Dr. Lindahl's January 2005 opinion as the evidence that supported the reduction in plaintiff's residual functional capacity and corresponding onset of disability.  Plaintiff contends that in finding that plaintiff was disabled no earlier than January 2005, the administrative law judge failed to properly apply

23

the commissioner's ruling regarding onset of disability, SSR 83-20, available at http://www.ssa.gov/OP_Home/rulings/di/01/SSR83-20-di-01.html (last visited October 2, 2007).  Under this ruling, determining when a disability of nontraumatic origin began requires consideration of the claimant's statement of when the disability began, the date the impairment caused the claimant to stop working and the medical evidence, with the most important factor being the medical evidence.  Having accepted Dr. Lindahl's January 2005 opinion as evidence of plaintiff's residual functional capacity, plaintiff argues, the administrative law judge should have accepted it as evidence of plaintiff's residual functional capacity as of the date on which plaintiff alleged he became disabled.  After all, argues plaintiff, his impairments did not "magically appear" in January 2005 and he had no significant change in his condition after his alleged onset of disability in July 2002.

I agree that the administrative law judge's determination that plaintiff was entitled to benefits as of January 25, 2005 did not hew exactly to the commissioner's rules regarding establishing the date on which the disability began.  I further agree that the administrative law judge took an overly restrictive view of Dr. Lindahl's opinion when he found that it described plaintiff's limitations only as of January 2005.  Adjudicators in social security cases routinely accept residual functional capacity assessments by treating or examining physicians as backward-looking evidence that speaks to the claimant's limitations during the entire time period under consideration and not merely as forward-looking evidence that applies only as

24

of the date on which the assessment was completed.  This is particularly so where, as here, the evidence does not show any material change in the claimant's condition after his or her alleged onset date.

Nevertheless, it is inconceivable that on remand, the administrative law judge would issue a decision more favorable to plaintiff.  The administrative law judge indicated in his decision that Dr. Lindahl's restrictive opinion was not "entirely persuasive" and stood in contrast to the objective medical evidence, which, apart from some tenderness and abnormal imaging scans, showed that plaintiff had normal reflexes, normal active range of motion and normal strength.  The administrative law judge also noted that plaintiff was treated only conservatively, had been issued a 25-pound lifting restriction by Dr. Jaikumar, had been examined only once by Dr. Lindahl and had been found capable of performing light work by the state agency physicians.   These inconsistencies would have provided the administrative law judge with ample reason to reject Dr. Lindahl's report in its entirety and in turn, deny plaintiff's claim for the entire time period at issue.  Instead, he gave plaintiff the benefit of significant doubt and accepted Dr. Lindahl's opinion, but only as evidence of plaintiff's limitations in January 2005.  If the administrative law judge committed any error, it lies in plaintiff's favor.   Accordingly, I see no reason to remand this case for a redetermination of the onset date.  Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest

25

of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

ORDER

IT IS ORDERED that the decision of defendant, Michael J. Astrue, Commissioner of Social Security, denying in part plaintiff Keith Martin's application for disability insurance benefits is AFFIRMED.

The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 4th day of October, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

26